In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 06-1570

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GIGI A. ZACCAGNINO,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 CR 10095—**Michael M. Mihm**, *Judge.*

---

ARGUED OCTOBER 17, 2006—DECIDED NOVEMBER 3, 2006

---

Before FLAUM, *Chief Judge*, and BAUER and EASTERBROOK, *Circuit Judges*.

FLAUM, *Chief Judge.* In September 2002, Gigi A. Zaccagnino, her husband Peter Zaccagnino, and Wendell Gates were indicted on a number of charges stemming from a fraudulent investment scheme. On March 23, 2005, Gigi Zaccagnino entered a plea of guilty on three separate counts: racketeering conspiracy (Count 1); conspiracy to commit mail fraud and wire fraud (Count 7); and money laundering conspiracy (Count 15). The other charges against her were eventually dropped. On February 15, 2006, Gigi Zaccagnino was sentenced to 97 months in prison. Her sentence reflected a ten-level increase pre-

scribed by the United States Sentencing Guidelines because the amount of laundered funds exceeded $20 million. Gigi Zaccagnino now appeals the sentencing court's finding that she was responsible for the entire amount of loss caused by the investment scheme. For the following reasons, we affirm.

## I. BACKGROUND

In 1997, Peter Zaccagnino began operating a fraudulent scheme in which he sold historical bonds—bonds issued by railroads or by foreign governments—to investors, falsely claiming that the bonds were valid security for a line of credit that could be used to buy notes in a high-yield investment.[1] In reality, the bonds had no value to anyone other than collectors. Peter Zaccagnino obtained over $6.8 million from the sale of these bonds. During this time, Gigi Zaccagnino attended meetings where her husband represented to investors that the bonds could yield seven to thirty percent of their valuation within a year. She also notarized some of the investment documents.

Peter Zaccagnino sold the historical bonds through two corporate entities and deposited most of the sales proceeds into the corporations' accounts. One of those corporations was Wonder Glass Products. Gigi Zaccagnino was the secretary, treasurer, and director of that corporation. She opened a corporate bank account for Wonder Glass in May 1997 and held sole signatory authority on the account. Just two days after Wonder Glass was incorporated, it began paying Gigi Zaccagnino a salary. In a

---

[1] Before the bond scheme began, Peter and Gigi Zaccagnino operated a used car business in Florida for several years. That business, Fleetwood Motors One, Inc., filed for bankruptcy in March 1998.

December 1998 credit card application, she represented that she received $5,200 a month from her employment with Wonder Glass.

In March 1998, Gigi Zaccagnino incorporated a business called Diamond in the Rough ("DIR") in the British Virgin Islands. Peter Zaccagnino promoted DIR as a firm that placed client funds into high-yield offshore investment programs, promising investors substantial earnings. Gigi Zaccagnino served as president, secretary, and director of DIR. Money from the historical bond sales was then transferred into an off-shore DIR bank account. Gigi Zaccagnino used $300,000 from that account to buy corporate stock in her name.

Throughout 1998, Peter Zaccagnino offered investors various "high-yield investments" that he claimed involved major international banks. To document the purported success of these investments, Peter Zaccagnino prepared and mailed fake account statements and other documents to investors. The statements showed substantial earnings on the bogus investments, which encouraged investors to send more money.

To further this scheme, Peter Zaccagnino held a meeting in Peoria, Illinois in October 1999. At the meeting, Gigi Zaccagnino sat at a table and made prospective investors promise that they would not record the meeting. Meanwhile, Peter Zaccagnino told them that they could make huge sums of money with the proposed investments and that he had been arranging similar investments successfully for so long that he was ready to retire. This foreign investment scheme earned Peter Zaccagnino millions in addition to the money from the historical bond sales.

The SEC began investigating the historical bond sales and obtained a preliminary injunction against Peter Zaccagnino in December 1998 and a permanent injunction

in June 1999. Notwithstanding the injunctions, Peter Zaccagnino continued selling the bonds. He was careful, however, about putting his name on corporate documents after the SEC investigation; instead, Gigi Zaccagnino and others served as corporate officers and directors of corporations involved in the criminal enterprise. For this reason, some of the people whose names appeared on corporate documents had no apparent connection to the fraudulent activities. For example, Marlene and Patsy Irace, Peter Zaccagnino's sister and brother-in-law, are listed as president and secretary of an entity that was used to deal with disgruntled investors, even though they were not aware of or involved in the investment scheme. Peter Zaccagnino also used his mother's name as a front for a corporation under his control.

The Presentence Report ("PSR") for Gigi Zaccagnino recommended that she be held accountable for the total loss related to the investment scheme—approximately $21,241,846.17. The PSR calculated her total offense level as 32, which included a ten-level increase because the loss amount exceeded $20 million. Before sentencing, Gigi Zaccagnino objected to the PSR's finding that she was responsible for the total loss amount. In particular, she argued that she should not be held accountable for funds received before December 1999, as she was unaware of the criminal conduct before that date.

At the sentencing hearing, Gigi Zaccagnino reiterated this argument, clarifying that she became aware of the criminal conduct in December 1999, when she overheard her husband and one of his business partners laughing about the falsity of the statements they sent to investors. This district court rejected Gigi Zaccagnino's version of events. The judge stated that although it considered the possibility that the defendant had been an innocent dupe in the early days of the conspiracy, in reviewing the record, he concluded that "her involvement . . . was simply too substantial." Tran-

script of Sentencing Hearing at 504, *United States v. Zaccagnino*, No. 03 CR 10095 (C.D. Ill. Feb. 15, 2006). Specifically, the court noted her role as a director of the corporations, her role as a signatory on the corporate accounts, and her involvement in the preparation of documents. *Id.* The court said to Gigi Zaccagnino, "I cannot pinpoint at what moment you became criminally aware of what your husband was doing, but I place it at a time earlier than you do." *Id.* at 519. The court further commented on her lavish lifestyle during the period of the conspiracy, noting that she spent "with wild abandon on real estate, cars, [and] jewelry," and that she lied "on virtually every application [she] made for credit or loan." *Id.* at 520.

## II. DISCUSSION

In determining relevant conduct under the guidelines, a defendant engaged in a jointly undertaken criminal activity is liable for all reasonably foreseeable acts performed in furtherance of the jointly undertaken criminal activity. U.S. SENTENCING GUIDELINES MANUAL § 1B1.3 (2004) (hereinafter "U.S.S.G."). However, "[a] defendant's relevant conduct does not include conduct of members of a conspiracy prior to the defendant joining that conspiracy; even if the defendant knows of that conduct." *Id.* at § 1B1.3, cmt. n.2(ii). Therefore, a sentencing court must assess the reasonable foreseeability of the loss by inquiring into the scope of the criminal activity the defendant agreed to undertake jointly. *United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir. 1993). Determining the amount of loss reasonably foreseeable to Gigi Zaccagnino was especially important in this case because U.S.S.G. § 2S1.1(b)(2) provides for a ten-level increase in a defendant's base offense level if the value of the funds involved in a money laundering scheme is greater than $20 million.

The definition of loss is a question of law subject to de novo review, while the amount of loss is a finding of fact reviewed for clear error. *United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000). Gigi Zaccagnino challenges the sentencing court's finding that she was involved in the conspiracy from the beginning and was therefore responsible for the entire loss occasioned by it. Because both the start date of her involvement in the conspiracy and the loss amount for which she is responsible are questions of fact, this Court reviews the district court's findings for clear error.

Although this case ultimately turns on whether Gigi Zaccagnino is responsible for a loss of less than $20 million, the government divides that question into two: (1) whether Gigi Zaccagnino waived the argument that she is responsible for only the $1,102,573.25 that she personally received; and (2) whether the district court plainly erred in finding that she was responsible for $21,241,846.17, the total amount of loss. Because Gigi Zaccagnino argued at all times that she was responsible for less than the total loss amount, and any amount under $20 million could lessen her sentence, it is unnecessary to consider the government's waiver argument.[2]

Gigi Zaccagnino argues that the district court clearly erred by holding her accountable for the entire loss occa-sioned by the fraudulent investment scheme because the

---

[2] The government essentially argues that because Gigi Zaccagnino claimed during other stages of the proceedings that she was responsible for a loss amount in the range of $5 million to $10 million, she cannot now claim that she is only responsible for approximately $1.1 million. Gigi Zaccagnino contends that she is using the $1.1 million figure as her fall-back position because there are only two "hard" numbers in this case relating to her criminal responsibility: the total amount of loss and the amount she personally received.

evidence demonstrates that she personally received only $1.1 million. However, Zaccagnino's reliance on the amount of money that she personally received is misplaced. If the court correctly determined that losses in excess of $1.1 million were reasonably foreseeable to the defendant after she joined the conspiracy, the amount she personally received is irrelevant.

Gigi Zaccagnino also claims that the district court is sentencing her based on her husband's activities rather than her actual involvement in the conspiracy, and that significant losses occurred before she joined the criminal enterprise. She contends that neither the PSR nor the sentencing court determined at what point she knowingly became involved in the fraudulent activities. Furthermore, she asserts, the government offered no evidence suggesting that she was aware of the criminal activity before late 1999. By then, the historical bonds scheme was essentially over.

Although no witness directly challenged Zaccagnino's claim that she was duped until 1999, the court chose not to credit her version of events. In fact, the court specifically said that it placed the defendant's awareness "at a time earlier" than she did. Transcript of Sentencing Hearing at 519, *Zaccagnino*, No. 03 CR 10095. We defer to the sentencing court's credibility assessment. *See Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 848 (7th Cir. 2005) (recognizing that a trial court's assessment of credibility can virtually never amount to clear error). The fact that Gigi Zaccagnino notarized documents, was a named officer, and opened corporate accounts in the early days of the scheme permit the inference that she participated in the conspiracy from the start. Moreover, the SEC injunction against Peter Zaccagnino in 1998, which should have put the defendant on notice of the criminal activity well before December 1999, also supports the district court's finding.

Gigi Zaccagnino also claims that the court failed to determine the scope of the agreement she entered into when she joined the conspiracy. We disagree. The district court specifically found that her involvement was substantial, and it reiterated some of the evidence supporting its conclusion: the corporate directorships, the signatory authority, and preparation of documents. As a result of her substantial involvement, the court expressly rejected the defendant's claim that she was an innocent dupe in the beginning. She attempts to align herself with other relatives of Peter Zaccagnino whose only involvement in the scheme was that their names appeared on corporate documents. As discussed above, however, Gigi Zaccagnino's involvement in the conspiracy went beyond having her name on corporate documents.

Finally, Gigi Zaccagnino seizes on the fact that the court said, "there was no legitimate business here period from what I've been able to determine. None." Transcript of Sentencing Hearing at 504, *Zaccagnino*, No. 03 CR 10095. Because the PSR recognized that the Zaccagninos legitimately operated a used car business for several years, Gigi Zaccagnino argues, the court's statement demonstrates a misunderstanding of the facts. Therefore, she reasons, its decision to hold her responsible for the entire loss was premised on error. This argument fails for two reasons. First, Gigi Zaccagnino takes the district court's statement out of context. The court was referring only to the illegitimacy of the investment scheme. Nothing in the transcript indicates that the court was questioning the legitimacy of a car dealership that went bankrupt in 1998. Second, the fact that the defendant may have assisted her husband in operating a legitimate business has no bearing on whether she was also helping him operate fraudulent ones.

Because Gigi Zaccagnino did not demonstrate that the sentencing court clearly erred in holding her accountable for

the entire amount of the investors' losses, we affirm her sentence.

### III. CONCLUSION

For the reasons outlined above, we AFFIRM Gigi Zaccagnino's conviction and sentence.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*