In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 06-3198 & 06-3623

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

TAMICA V. HOLLINGSWORTH,

*Defendant-Appellee,*

and

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES E. MCCOTRY,

*Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 06-CR-25—**David F. Hamilton**, *Judge.*

_____

ARGUED JUNE 8, 2007—DECIDED JULY 31, 2007

_____

Before POSNER, FLAUM, and MANION, *Circuit Judges.*

FLAUM, *Circuit Judge.* Police arrested Tamica Hollingsworth and James McCotry after police searched their apartment and found marijuana and crack cocaine. A grand jury indicted McCotry for possession with intent to distribute crack cocaine (Counts One and Two) and

marijuana (Count Three) in violation of 21 U.S.C. § 841(a)(1). It indicted Hollingsworth for possession of marijuana (Count Four) in violation of 21 U.S.C. § 844(a) and managing or controlling a place and knowingly making the place available for the storage or use of a controlled substance (Count Five) in violation of 21 U.S.C. § 856(a)(2). Hollingsworth and McCotry moved to suppress the evidence uncovered during the search, and the district court granted Hollingsworth's and denied McCotry's motion. McCotry went to trial, and a jury convicted him on two counts of possession of crack cocaine, lesser offenses included in Counts One and Two, and possession with intent to distribute marijuana, Count Three. The district court imposed a 188-month sentence on the lesser offenses included in Counts One and Two and a concurrent 120-month sentence on Count Three.

The government appeals the district court's ruling on Hollingsworth's motion to suppress, and McCotry appeals his conviction and sentence. For the following reasons, we reverse the district court's ruling on Hollingsworth's motion to suppress and affirm McCotry's conviction and sentence.

## I. Background

Between August and December 2005, Hollingsworth's nine-year-old daughter, T.H., was late for school more than twenty times and was referred to the principal's office for disciplinary reasons at least six times. The school's truancy police officer, Steve Denny, attempted to contact Hollingsworth on several occasions to discuss T.H.'s excessive absences from school, but his efforts were unsuccessful.

On December 6, 2005, T.H.'s principal, Darlene Westerfield, called T.H. to her office to speak about her behavior and tardiness. Westerfield wanted to include Hollingsworth in the meeting, so she attempted to contact

her by telephone, but Hollingsworth did not answer. As a result, Westerfield wrote a note asking Hollingsworth to be at school at 10:00 a.m. the following day and instructed T.H. to deliver the note to her mother.

The next day, Hollingsworth did not show up for the meeting as requested, and Westerfield reiterated to T.H. that she needed to speak with her mother. T.H. said that her mother would not answer the telephone if she saw the school's phone number on the caller ID. Westerfield responded that if she could not reach Hollingsworth by telephone, she would have to send Officer Denny for a home visit. T.H. told Westerfield that Officer Denny could not come to her home until her mother and her boyfriend, "Jay," had a chance to get rid of their "stuff" and that there were things in the home that her mother did not want anyone to see. T.H. then began to cry and explained that her mother occasionally left her home alone and that it frightened her.

Westerfield told Denny about the meeting with T.H., and he contacted the school social worker, Julie Hoyt, and asked her to speak with T.H. Around the same time, Hollingsworth finally called the school and spoke with Denny. They discussed T.H.'s tardiness, and Denny attempted to schedule a home visit. Hollingsworth refused to allow Denny into her home but agreed to come to school that day. She arrived at 2:00 p.m., and Denny spoke with her about T.H.'s attendance problems. He did not tell her about T.H.'s previous statement to Westerfield about the "stuff," however, because he considered Hollingsworth a criminal suspect.

Meanwhile, Hoyt spoke with T.H. in another part of the school.[1] T.H. said that the "stuff" that she previously had mentioned to Westerfield was marijuana and that she

---

[1] The district court found that the sole reason Hoyt interviewed T.H. was to pursue a criminal investigation against her mother.

saw it in her home every day. She also told Hoyt that her mother and Jay often went on drug runs and either left her home alone or brought her along. T.H. told Hoyt that she had been left alone many times, that her mother and Jay smoked "blunts" in the home, that she had seen marijuana on the kitchen table, and that she saw it on top of her mother's bedroom dresser the previous night. T.H. did not describe the marijuana except to say that it was green. After a twenty-minute conversation with Hoyt, T.H. returned to her classroom.

At approximately 2:30 p.m., Hoyt told Denny what T.H. said, and Denny, in turn, relayed the information to Drug Task Force Detective Cliff Cole. Cole then contacted the prosecutor's office about obtaining a warrant to search Hollingsworth's home. A short time later, Denny testified about his conversations with Westerfield and Hoyt before a Madison Superior Court judge. At the conclusion of the testimony, the judge issued a search warrant for 5825 Apple Creek Way.

Police executed the warrant at 3:25 p.m. that day, and McCotry and Hollingsworth were inside the home. Police found $900 and 7.86 grams of crack cocaine in McCotry's pockets as well as fifty grams of crack cocaine, more than a kilogram of marijuana, a firearm, and $9,000 in cash in a dresser drawer in the master bedroom. McCotry's fingerprints were on a plastic bag containing some of the marijuana, and a number of his personal belongings, including his clothes, shoes, toiletries, and mail, were found throughout the home.

McCotry and Hollingsworth moved to suppress the evidence discovered during the search, and after conducting a hearing, the district court granted Hollingsworth's motion and denied McCotry's motion. It concluded that police violated Hollingsworth's substantive due process rights and that the "police questioning of T.H. by school

personnel without her mother's knowledge, while she was removed from class during school hours all for the sole purpose of incriminating her mother, amount[ed] to the kind of governmental abuse of power that 'shocks the conscience.'" As for McCotry, the district court held that although the officers did not have probable cause to obtain a warrant, the good faith exception to the exclusionary rule prevented the suppression of evidence.

McCotry went to trial, and the district court, over McCotry's objection, mistakenly allowed the government to introduce a part of McCotry's suppression hearing testimony in which he admitted that he lived at the 5825 Apple Creek Way residence. The government reminded the jury of the testimony during its closing argument.

At the trial's conclusion, the district court submitted a verdict form that instructed the jury to make findings on drug quantity if it found McCotry guilty of the charged offenses. On Count One, the district court instructed the jury to determine whether McCotry possessed with intent to distribute at least fifty grams of crack cocaine, and on Count Two, it instructed the jury to determine whether McCotry possessed with intent to distribute at least five grams of crack cocaine. The district court also instructed the jury to determine whether McCotry was guilty of simple possession of crack cocaine, a lesser offense included in Counts One and Two. Unfortunately, however, the court did not instruct the jury to determine the quantity of drugs that McCotry possessed if it found him guilty of the lesser included offense. The jury ultimately found, on Counts One and Two, that McCotry was not guilty of possession of crack cocaine with intent to distribute, but guilty of simple possession. The jury also found McCotry guilty on Count Three.

At sentencing, the district court recognized that absent a drug quantity finding by the jury McCotry's maximum

sentence should have been ten years, because *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), requires a jury to find facts that are necessary to increase a defendant's maximum sentence. Nevertheless, the court imposed a 188-month sentence on Counts One and Two and a concurrent 120-month sentence on Count Three. It concluded that the *Apprendi* error was harmless because the parties did not dispute that the amount of crack cocaine involved in Counts One and Two exceeded five grams.[2] The court set McCotry's base offense level at 32 and increased it by two levels, under U.S.S.G. § 2D1.1(b)(1), because McCotry possessed a firearm in the course of the offense.

The government appeals the district court's ruling on Hollingsworth's motion to suppress. McCotry appeals the district court's ruling on his motion to suppress, the admission of his suppression hearing testimony, and his sentence.

## II. Analysis

### A. Hollingsworth's Motion to Suppress

The government argues that the district court erred by granting Hollingsworth's motion to suppress because school officials did not violate her constitutional rights when they interviewed T.H. about her prior statement to Westerfield. Hollingsworth responds that Officer Denny violated her right to familial relations by having Hoyt

---

[2] On Counts One and Two, McCotry was sentenced under 21 U.S.C. § 844(a), which states, "[A] person convicted under this subsection for the possession of a mixture or substance which contains cocaine base shall be imprisoned not less than 5 years and not more than 20 years, and fined a minimum of $1,000, if the conviction is a first conviction under this subsection and the amount of the mixture or substance exceeds 5 grams."

interview T.H. without Hollingsworth's permission and for the sole purpose of pursuing a criminal investigation. We review the district court's ruling on this issue de novo. *See United States v. Davis*, 15 F.3d 1393, 1415 (7th Cir. 1994) ("Whether the government has stepped beyond permissible constitutional bounds in attempting to enforce the law is a legal question.").

The district court relied on the dissenting opinions in *United States v. Penn*, 647 F.2d 876, 885 (9th Cir. 1980), to conclude that the school officials in this case violated Hollingsworth's due process rights. In *Penn*, the Seattle police had been investigating Clara Penn for two years on suspicion that she was distributing heroin. Officers executed a search warrant at Penn's house and found a quantity of cocaine but could not locate any heroin. Penn's children, ranging in ages from five to twenty-two, were all present and taunted the police, making it clear that they knew about their mother's drug-related activities. At one point during the search, one of the officers took the youngest child, Reggie, to use the bathroom and asked him if he knew where his mother hid the balloons of heroin. Reggie indicated that he did, but hesitated to reveal their location. After the officer offered Reggie five dollars, Reggie took the officer to a spot in the backyard where the heroin was buried.

The Ninth Circuit heard the case en banc and, in a 5-4 decision, held the evidence admissible. It rejected Penn's substantive due process argument, noting that "the police may pay informants to give information; very young children may aid criminal investigations; and sons may inform or testify against mothers." *Id.* at 880. The court stated that even though all three factors were present at once, there was no due process violation. It also held that the police did not violate Penn's Fourth Amendment rights. *Id.* at 883.

Judge Goodwin dissented from the majority's opinion on the Fourth Amendment issue and stated,

> [B]y offering money to the defendant's five-year-old son, the police intruded in this case on a family relationship that is highly valued. Confidence between parents and their children enhances preservation of the family unit, an interest which the law should promote when it has the opportunity. At least, the law should not unnecessarily make parents and children apprehensive about exchanging information. Nor should the law encourage children to turn against their parents.

*Id.* at 887. Then-Judge Kennedy also dissented, calling the police practice "both pernicious in itself and dangerous as precedent." *Id.* at 888-89.

In this case, the district court ruled that the government violated Hollingsworth's substantive due process rights because school officials' treatment of T.H. was more egregious than the treatment of the child in *Penn.* It emphasized that T.H. was unaware that she was giving information to the police, that Hoyt used T.H.'s state-mandated presence in school to interrogate her, and that the interrogation was premised on one vague statement about T.H.'s mother needing to get "stuff" out of her home. Finally, the district court observed that Denny made an effort to conceal Hoyt's interview from T.H.'s mother and that Hoyt's questioning posed a significant risk of psychological harm.

The Supreme Court has long recognized the constitutional importance of a parent's right to bring up his or her child as he or she sees fit. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). As we have said before, "the right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights—the foundation of not

just this country, but of all civilization." *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000). Nevertheless, the government's intrusion into the protected sphere of familial relations violates substantive due process only if "the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999); *see also Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997) ("[T]he substantive due process component of the Fourteenth Amendment . . . bars certain government actions regardless of the fairness of the procedures used to implement them.") (internal quotation omitted). Courts determine whether the government has violated an individual's right to familial relations by balancing the individual's and the state's competing interests. *See Doe v. Heck,* 327 F.3d 492, 520 (7th Cir. 2003); *Griffin v. Strong*, 83 F.2d 1544, 1547 (10th Cir. 1993).

In *Tenenbaum*, after a young child suggested to her teacher that her father had sexually abused her, child abuse investigators removed the child from school for several hours—without a court order or permission from her parents—so that a doctor could examine her for possible sexual abuse. The Second Circuit held that this act did not violate the child's or her parents' substantive due process rights, rejecting the notion that "brief removals of children from their parents to protect them from abuse are 'without any reasonable justification in the service of a legitimate governmental objective.'" *Tenenbaum,* 193 F.3d at 601 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)); *see also Nicholson v. Scopetta*, 344 F.3d 154, 172 (2d Cir. 2003) (holding that child abuse investigators did not violate substantive due process when they removed children from their parents for up to three days because of reasonable suspicions that the children were witnessing domestic violence). By contrast, in *Doe*, we held that child abuse investigators

violated the substantive due process rights of a child and his parents when they conducted a custodial interview of the child without the parents' consent and the investigators had *no evidence* that the child was being abused. 327 F.3d at 524.

In this case, the government's interest in speaking with T.H. was compelling because it had at least some reason to believe that Hollingsworth was engaged in illegal activity. *See United States v. Amerson*, 483 F.3d 73, 87 (2d Cir. 2007) ("There can be little doubt that the government has a compelling interest in rapidly and accurately solving crimes . . . ."); *Johnson v. City of Cincinnati*, 310 F.3d 484, 502-03 (6th Cir. 2002). Denny knew that T.H. was repeatedly late to school, that Hollingsworth refused to speak with school officials about the problem, that she did not want Officer Denny coming to the home before she could remove her "stuff," and that she had left her nine-year-old child alone at home on a number of occasions. Though this information, by itself, was not enough to establish probable cause, the statement was suspicious and suggested—at least to some degree—that Hollingsworth was exposing her child to drugs.

Hollingsworth's interest in maintaining a relationship with her child free from state interference is also significant, but school officials' intrusion on that interest was minimal. In fact, we question whether such a *de minimis* intrusion could ever "shock the conscience." *See Pittsley v. Warish*, 927 F.2d 3, 9 (1st Cir. 1991) (holding that police officers did not violate the substantive due process right of familial relations when they told children, "if we see your father on the streets again, you'll never see him again," because the act did not involve any physical touching or physical injury and was not directed at the parent-child relationship). The interviews took place at T.H.'s public school and were conducted by school officials only after T.H. voluntarily confided in them. Together, the

interviews lasted less than a half an hour and involved no coercive interrogation techniques.

It is true that in *Doe*, we held that child abuse investigators violated substantive due process rights when they interviewed a child at school without his parents' permission, but in that case, the government's interest was nonexistent, and the interview was conducted by strangers over the objection of school officials. When a parent sends her child to school, she delegates some of her parenting responsibilities to school officials. Though she does not consent to overzealous investigators interrogating her child over the principal's objection (as occurred in *Doe*), she should reasonably expect that school officials will speak with her child if the child raises serious concerns about her home life. In short, the government's interest in this case was greater, and the intrusion into familial relations lesser, when compared to the corresponding interests in *Doe*.

Indeed, we believe that the case is more like *Tenenbaum* and *Scopetta*, where the government had a compelling interest in removing children from their homes that sufficiently outweighed the intrusion on the parent's interest in familial relations. Those cases involved more demanding interests on both sides of the balance, but the important thing was that the governmental action was not arbitrary in light of valid concerns about child safety. Protecting children from parental abuse may be a more pressing matter than solving drug crimes, but a short interview by school officials is a minimal deprivation that requires little justification when it comes to avoiding a substantive due process violation. Hoyt's interview was not "without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento*, 523 U.S. at 846.

We also believe, contrary to the district court, that the Ninth Circuit's decision in *Penn* supports this conclusion.

Whereas in *Penn* the officer interviewed and bribed a young child hesitant to offer incriminating information about his mother, Hoyt interviewed T.H.—without coercion or bribes—after she volunteered suspicious information to the principal. Officer Denny may have asked social worker Hoyt to conduct the interview so that T.H. would be more forthcoming, but even if that could be considered a form of trickery, it was not as unsettling as the bribe in *Penn*.[3] The only district court decisions that have considered this issue also support our approach. *See Grendell v. Gillway*, 974 F. Supp. 46, 53 (D. Me. 1997) ("That Stanko did not seek the consent of Grendell's parents before permitting Gillway to interrogate Grendell can hardly be said to 'offend the community's sense of fair play and decency.'") (quoting *Rochin v. California*, 342 U.S. 165, 173 (1952)); *United States v. Levasseur*, 699 F. Supp. 995, 1008 (D. Mass. 1988) (holding that police do not violate substantive due process rights when they attempt to elicit, through bribery, information from a child about her parents).

## B. McCotry's Motion to Suppress

McCotry argues that the district court erred by denying his motion to suppress and applying the good faith exception to the exclusionary rule. This Court reviews de novo a district court's legal conclusion that a law enforcement officer relied in good faith on a subsequently invalidated search warrant. *See United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002). In *United States v. Leon*, 468 U.S. 897, 922 (1984), the Supreme Court concluded that the benefits

---

[3] To the extent that T.H. suffered psychological harm because of this ordeal, it cannot be attributed to Hoyt's interview, which, by itself, caused very little trauma. Instead, the blame falls squarely on the shoulders of her mother, who risked her relationship with her nine-year-old daughter by dealing drugs.

of suppressing evidence are "marginal or non-existent" compared to the social costs when officers objectively and reasonably rely on a subsequently invalidated search warrant. The Court said that an officer's decision to obtain a warrant is prima facie evidence that he acted in good faith, but noted that a defendant may rebut the good faith presumption by showing that the issuing judge abandoned his role as a neutral arbiter, that the officers were dishonest or reckless in preparing the affidavit, or that the affidavit was so lacking in probable cause that no officer could have relied on it. *Id.* at 922-23.

McCotry relies on the third method of rebutting the presumption of good faith, asserting that Officer Denny's testimony involved multiple levels of hearsay (he testified about Westerfield's and Hoyt's statements about T.H.'s statements) and that T.H.'s statement lacked sufficient indicia of reliability. McCotry's argument confronts a significant obstacle, however, for we previously have noted that

> [w]hen evidence has been obtained pursuant to a subsequently invalidated search warrant . . . we will admit the evidence unless: (1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

*Koerth*, 312 F.3d at 869 (internal quotation omitted). Because Officer Denny's testimony before the magistrate was not plainly deficient, McCotry must point to an analogous case in which we held that a warrant was not supported by probable cause.

In *Koerth*, we said that when the evidence supporting an application for a search warrant consists only of a tip from an informant, the Court must consider a number of facts to determine whether the evidence establishes probable cause: (1) the degree to which police corroborated the informant's statements; (2) the degree to which the informant's knowledge of the events was acquired through firsthand observation; (3) the amount of detail included in the informant's statement; (4) the amount of time between the date of the events and the police officer's application for the search warrant; and (5) whether the informant appeared before the magistrate who issued the warrant. *Id.* at 866. In that case, we held that the search warrant affidavit did not establish probable cause because it merely recited an informant's uncorroborated, conclusory assertion of criminal activity from a named informant of unknown reliability. *Id.* at 868. Nevertheless, the Court held that the good faith exception applied because even though our case law had held that conclusory allegations from a *confidential* informant were insufficient to establish probable cause, we never had held that the same allegations from a *named* informant were insufficient. *Id.* at 870.

In *United States v. Mykytiuk*, 402 F.3d 773, 775 (7th Cir. 2005), police searched the home of a man named Soltau and found anhydrous ammonia. Soltau claimed that he and the defendant had stolen the chemicals and that the defendant stored materials for manufacturing methamphetamine in two five-gallon buckets, which he kept in vehicles parked at his residence. He also stated that the defendant usually carried a loaded firearm in his vehicle. The Court held that this information was insufficient to establish probable cause because police offered no meaningful information to corroborate Soltau's statement and because the affidavit only provided one small detail—the defendant's storage of materials in five-gallon buckets—to support the statement's accuracy. *Id.* at 776-77. Again,

however, the Court declined to suppress the evidence, concluding that the officers relied on the warrant in good faith. It said that unlike previous cases, the search warrant affidavit provided some detail and some corroboration (though minimal), since police found evidence of methamphetamine production at Soltau's residence, and Soltau described where the defendant stored his ingredients. *Id.* at 777.

In this case, T.H.'s statement about her mother's illegal drug activity was more detailed than the informant's statement in *Mykytiuk*. She noted that her mother had marijuana in the home "all the time," that she had seen it on the kitchen table as recently as the night before, and that her mother lived in the home with her boyfriend named "Jay." Additionally, the source of the statement was more reliable than the informant in *Mykytiuk*, who implicated his codefendant immediately after being arrested. *See Lee v. Illinois*, 476 U.S. 530, 541 (1986) ("Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.") (internal quotation omitted). Because the informant's statement in *Mykytiuk* is distinguishable from the one that T.H. provided, we agree with the district court that Officer Denny relied on the search warrant in good faith.[4]

McCotry makes much of the fact that Officer Denny's testimony before the magistrate was based on double

---

[4] McCotry also argues that the Indiana Supreme Court's decision in *State v. Spillers*, 847 N.E.2d 949, 954 (Ind. 2006), should have made the officers in this case aware that the warrant was not supported by probable cause. In *Spillers*, however, the magistrate issued a warrant based on an informant's statement that made purely conclusory allegations of drug activity and provided no supporting details.

hearsay, but we have repeatedly stated that a search warrant need not be based on first-hand observations. *See United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir. 1995); *United States v. Chapman*, 954 F.2d 1352, 1370 (7th Cir. 1992). Reliability is the touchstone for determining whether an informant's statement is sufficient to establish probable cause. *Koerth*, 312 F.3d at 867-68. If the individuals providing the informant's statement to the magistrate are reliable, then it makes little difference whether there are one or two levels of hearsay. Here, T.H. spoke with a school social worker who relayed T.H.'s statements to a police officer who relayed them to a magistrate judge. Because there was no reason to question the reliability of the social worker or the police officer, the double hearsay did not affect the magistrate's probable cause determination.

## C.  Admission of Suppression Hearing Testimony

McCotry next argues that we should reverse his conviction because the district court allowed the government to read portions of his testimony at the suppression hearing, even though he exercised his Fifth Amendment right not to testify at trial. The government concedes that the district court erred by allowing the testimony. In *Simmons v. United States*, 390 U.S. 377, 394 (1968), the Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." The government maintains, however, that the error was harmless. *See Chapman v. California*, 386 U.S. 18, 22-24 (1967) (holding that a court must determine whether a Fifth Amendment violation is harmless beyond a reasonable doubt). We agree.

McCotry's testimony at the suppression hearing supported the government's argument that McCotry lived at the 5825 Apple Creek Way apartment, which in turn, supported the government's argument that McCotry possessed the drugs that were found there. However, the government already had ample evidence that McCotry possessed the drugs and that he lived in the home. The crack cocaine associated with Count One was found in McCotry's pocket, and the packaging that held the marijuana for Count Three had his fingerprints on them. Moreover, the crack cocaine associated with Count Two (the same drug found in his pocket) was stored together with the marijuana in the bedroom that McCotry occupied. Though McCotry disputes that he lived at the Apple Creek address, Hollingsworth's mother testified to the contrary, and police found a number of McCotry's personal belongings in the home, including his clothing, shoes, toiletries, and mail. Additionally, one of the closets in the bedroom contained only McCotry's possessions. In sum, the government's recitation of suppression hearing testimony—though a violation of a constitutional right—was duplicative, and its admission was harmless error. *See United States v. Folks*, 236 F.3d 384, 390 (7th Cir. 2001) (holding that an improper jury instruction was harmless where the defendant's fingerprints were found on plastic bags containing drug residue and a trial witness testified that the defendant sold drugs out of the home that was searched).

### D. *Apprendi* Error

Finally, McCotry argues that the district court erred by increasing his maximum sentence based on facts not proved to a jury beyond a reasonable doubt. The government concedes that McCotry's sentence violated *Apprendi* but contends that the error was harmless. *See United*

*States v. Adkins*, 274 F.3d 444, 454 (7th Cir. 2001) ("*Apprendi* errors in both the indictment and the charge to the jury are subject to harmless error analysis."). The absence of a jury finding on drug quantity is harmless only "if it is clear beyond a reasonable doubt that a properly instructed jury would have found the defendant responsible for the requisite quantity of drugs." *United States v. Arocho*, 305 F.3d 627, 638 (7th Cir. 2002).

In this case, there is no doubt that the jury would have held McCotry responsible for at least five grams of crack cocaine—the amount necessary to support his 188-month sentence—had it properly been instructed. The district court informed the jury that Count One related to the crack cocaine "allegedly found in the bedroom of the apartment" and that Count Two related to the crack cocaine "allegedly found on . . . McCotry's person." Police testified that they found two bags containing twenty-six and twenty-four grams of crack cocaine in the bedroom and more than seven grams of crack cocaine on McCotry's person. McCotry offered no evidence or argument that the police incorrectly weighed the drugs, arguing instead that Hollingsworth, not he, possessed them. The jury rejected this argument by finding McCotry guilty of simple possession on both Counts One and Two. It is highly unlikely that a jury would have concluded—without support from the evidence or arguments—that McCotry possessed only a portion of the seven grams of crack cocaine found in his pocket or less than five of the fifty grams found in his bedroom. Accordingly, the *Apprendi* error was harmless.

### III. Conclusion

For the foregoing reasons, the Court REVERSES the district court's ruling on Hollingsworth's motion to suppress and AFFIRMS McCotry's conviction and sentence.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*