In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-4595 & 06-1386

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHNNY P. WATTS and JONATHAN B. CULBERT, JR.,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 03 CR 278—**J.P. Stadtmueller**, *Judge.*

———————

ARGUED SEPTEMBER 5, 2007—DECIDED JULY 25, 2008

———————

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Jonathan Culbert, Jr., and Johnny Watts were indicted, along with a number of other defendants, for their involvement in a scheme to cash stolen Treasury checks and launder the proceeds. A jury found Watts guilty of one count of conspiracy to commit bank fraud and transport stolen checks in interstate commerce, *see* 18 U.S.C. §§ 371, 1344, 2314, and a second count of conspiracy to commit money laundering, *see id.* § 1956(h). The district court sentenced him to a total of eighty-six months' imprisonment and ordered him

to pay $105,087 in restitution. Two months later, at a separate trial, a different jury found Culbert guilty of the same two crimes. The district court sentenced him to a total of forty-two months' imprisonment and imposed $16,931 in restitution. Both defendants now appeal their convictions and sentences. We affirm the judgments in all respects.

## I.

The two juries found that Watts and Culbert played a part in the same conspiracies, but neither man knew the other. Each defendant instead dealt principally with Gene Vaughn, the central figure in the conspiracy. The defendants' respective roles in Vaughn's scheme are summarized in relevant part below.

### A.  Jonathan Culbert, Jr.

In early 2001 Culbert's sister, Sheryl, solicited Florida resident Marlon Holt to cash stolen Treasury checks. At the time she did not reveal the source of the stolen checks. Holt, in turn, asked Vaughn, a Wisconsin resident who partnered with Holt in previous forgery schemes, to incorporate a fake check-cashing corporation. In March of that year, Holt and Vaughn, using aliases, incorporated "EZ Check Cashing" and opened a corporate checking account in that name at a Wells Fargo branch in Milwaukee. The two agreed that Holt would get the stolen checks from Sheryl's roommate, Alvyna Sanders, and send them on to Vaughn for deposit into the EZ Check Cashing account. The take was to be split into thirds: one third to be shared by Sheryl and

Holt, one-third for Sheryl's source, and one-third for Vaughn.

During a conversation in the summer of 2001, Sheryl hinted to Holt that her brother, Culbert, a Postal Service employee working at the Los Angeles Processing and Distribution Center ("LAPDC"), was the source of the stolen checks. Sheryl later introduced Culbert to Holt and, on three separate occasions, confirmed that Culbert was stealing from the mail the checks she was sending to Holt. Culbert had even engineered a schedule change that summer from the day shift to the night shift, giving him greater access to the machine that sorted Treasury checks.

The stolen Treasury checks consisted mostly of income tax refunds from the IRS and benefit checks from the Social Security Administration, all but one of which were payable to California residents. At first, Vaughn paid Sheryl and Holt by mailing checks drawn on the EZ Check Cashing account to Holt, who would take his cut and send the balance on to Sheryl in California. Soon, however, Vaughn bypassed Holt and began distributing funds directly to Sheryl through Sanders, who had opened a bank account in California where the roommates lived. Culbert continued to supply Vaughn with stolen Treasury checks at least until the end of September 2001, and by that point Vaughn had deposited just over 200 checks totaling over $375,000. But the precise number of checks supplied by Culbert is uncertain because, as we will see, during part of that time Watts also was providing Vaughn with Treasury checks stolen in California.

In November 2002 federal investigators executed a search warrant at Culbert's home. The warrant, predi-

cated on an affidavit authored by IRS Special Agent
Thomas Gluntz, noted that persons who commit forgery
crimes typically retain in their possession items relating
to those crimes. One item found in Culbert's bedroom
during the search was a stolen check in the amount of
$13,756. That uncashed check, which would have been
processed through LAPDC, was issued by Holy Family
Hospital in payment for services to Sulzer Orthopedics,
Inc.

**B.  Johnny Watts**

Watts, another California resident, first met Vaughn in
July 2001 while delivering a Cadillac Escalade to a
mutual friend in California. During this meeting Vaughn
boasted about some of his illegal activities, including
the creation and operation of EZ Check Cashing. Watts
then disclosed that he also had access to stolen Treasury
checks, and a week later he telephoned Vaughn to
inform him that a batch had just been received. Vaughn
proposed that Watts give him the checks and let him
deposit them into the EZ Check Cashing account. Vaughn
suggested that Watts could receive his cut by opening
a Wells Fargo account in Los Angeles and giving the
account number to Vaughn so that Vaughn could write
checks to Watts on the EZ Check Cashing account and
deposit them in Milwaukee. Watts agreed to the plan,
which called for an even split between the two men.

In August 2001, Watts used a false social security num-
ber and a phony drivers license to open an account with
Wells Fargo in Los Angeles. Watts gave as his "street
address" the address for a "Road Runner" maildrop he had
rented (with yet another fake name and address) two

weeks earlier. That same day in Milwaukee, Vaughn deposited into Watts's account three checks drawn on the EZ Check Cashing account for $8,700, $8,700, and $3,600. By the end of September, Vaughn had deposited seven more such checks for a grand total of $62,900.

By October 2001, Wells Fargo had shut down the EZ Check Cashing account and Watts's personal account. After that, between November 2001 and April 2002, Watts mailed Vaughn at least four packages containing stolen Treasury checks. Vaughn twice responded by sending Watts checks drawn on a newly opened Wells Fargo account in the name of "Tax Returns by Redd," which Vaughn had opened to replace the defunct EZ Check Cashing account. The address Watts used on his mailings, much like the one he used to open his Wells Fargo account, was in fact the address of "Mail Boxes 4 U," another maildrop where Watts had rented a mailbox under an alias. Watts later had his wife, Cheryl, open a new Wells Fargo account in California so that Vaughn could resume depositing Watts's cut in Milwaukee instead of mailing checks to him in California. The "street address" Cheryl used was once again the address of a commercial maildrop, not the couple's residence. Wells Fargo, however, caught up with Vaughn again and closed down his Tax Returns by Redd account in late April 2002. At that point, Vaughn stopped getting checks from Watts and the conspiracy ended. By then Watts had provided Vaughn with stolen Treasury checks totaling $135,100, of which his cut had been $67,550.

## C. Trials

In January 2005 a federal grand jury in Milwaukee returned an indictment against Sheryl, Holt, Vaughn, and

Culbert. Two months later the grand jury returned a
superseding indictment adding Watts. Sheryl, Holt, and
Vaughn all pleaded guilty. Culbert, arguing that Special
Agent Gluntz's affidavit did not establish probable
cause, moved to suppress the evidence obtained during
the November 2002 search of his residence. The district
court denied the motion, reasoning that the affidavit
included sufficient facts to demonstrate probable cause
that evidence of Culbert's involvement in the stolen-
check ring might be found at his residence.

Watts, who was tried in July 2005 before Culbert, moved
in limine to exclude evidence that he and Cheryl opened
their Wells Fargo accounts using addresses for com-
mercial mailboxes rented under aliases. The district court
reserved ruling on this motion and then denied it after
three days of trial testimony. Culbert, tried separately
in September 2005, moved in limine to exclude evid-
ence that he also had provided stolen Treasury checks
to others not involved in this scheme. Once again the
court reserved ruling, and once again after three days
of trial testimony the court allowed the evidence in.

## II.

Together, Culbert and Watts raise eight issues on
appeal, three of which concern the district court's ad-
ministration of the trial and five that concern sentencing.
We discuss each issue in turn, providing additional facts
as necessary.

## A.  Jonathan Culbert, Jr.

### 1.  Search Warrant

Culbert first argues that the district court erred by not granting his motion to suppress the fruits of the search of his residence. He argues, as he did in the district court, that Special Agent Gluntz's affidavit did not establish probable cause to believe that incriminating evidence would be found in his home and thus, he continues, the warrant was invalid. In reviewing the denial of a motion to suppress, we review the district court's findings of historical fact for clear error and its legal conclusions de novo. *United States v. Garcia*, 528 F.3d 481 (7th Cir. 2008). And on the mixed question of whether the facts in the supporting affidavit add up to probable cause, we give no weight to the district court's decision but "afford 'great deference' to the issuing judge's conclusion." *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008).

Probable cause to issue a search warrant is established when, based on the totality of the circumstances, the supporting affidavit sets forth circumstances sufficient for a reasonably prudent person to believe that a fair probability exists of finding contraband or evidence of a crime. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Lowe*, 516 F.3d 580, 585 (7th Cir. 2008). Probable cause means "a probability or substantial chance," not absolute certainty. *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006).

Special Agent Gluntz tied Culbert to the stolen Treasury checks by disclosing in his affidavit that Vaughn had told others that a postal employee from California was supplying the stolen checks, that Culbert's sister, Sheryl,

was passing stolen checks to Vaughn through Holt, that Culbert worked at LAPDC, and that $3,500 from the EZ Check Cashing account had been given to Culbert through Sheryl. But in suggesting that evidence of Culbert's involvement would be found in his residence, Gluntz did little more than represent that he knew from past experience that persons involved in the theft of mail and in laundering money often retain possession of items relating to their crimes.

Looking only within the four corners of the affidavit, a judicial officer easily could conclude that the involvement of Culbert's sister, coupled with his employment at LAPDC and his receipt of $3,500 traceable to the EZ Check Cashing account where the stolen checks were being deposited, adds up to probable cause. Yet, even affording "great deference" to the issuing judge's decision, the relative scarcity of evidence that the fruits of Culbert's participation in the scheme could be found at his residence gives us some pause. We recognize that involvement in ongoing criminal activity may go a long way in supplying probable cause to search a participant's residence for evidence relating to the unlawful conduct, *e.g.*, *United States v. Hoffman*, 519 F.3d 672, 676 (7th Cir. 2008); *United States v. Caldwell*, 423 F.3d 754, 760-61 (7th Cir. 2005); *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991), especially in white-collar cases likely to generate a paper trail, *e.g.*, *United States v. Nguyen*, 526 F.3d 1129, 1131-34 (8th Cir. 2008); *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) ("One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home."). But, in effect, the affidavit in this case merely states, without explanation,

that participants in the kinds of crimes at issue here "commonly" have evidence "in their possession." That may be true, but Special Agent Gluntz was seeking approval to search Culbert's house and failed to provide any specifics as to why he might find evidence at his home as opposed to at his workplace, in his car, on his person, or in a safe deposit box. Indeed, in this court the government cites not one case suggesting that the affidavit convincingly establishes a link to Culbert's residence.

Still, we ultimately may avoid this question because we agree with the government that the fruits of the search survive under the good-faith exception of *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court held that suppression of evidence seized pursuant to a search warrant that is later declared invalid is inappropriate if the officers who executed the warrant relied in good faith on the issuing judge's finding of probable cause. *Id.* at 924; *United States v. Hollingsworth*, 495 F.3d 795, 803 (7th Cir. 2007); *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007). The very decision to obtain a warrant, after all, is prima facie evidence of good faith. *Leon*, 468 U.S. at 920-21; *United States v. Wiley*, 475 F.3d 908, 917 (7th Cir. 2007). A defendant can rebut the presumption of good faith by showing, as relevant here, that the supporting affidavit is so facially deficient that no reasonable officer could have relied upon it. *Leon*, 468 U.S. at 922-23; *Hollingsworth*, 495 F.3d at 803; *United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002). Here, we cannot conclude that the affidavit is so deficient that a reasonable officer would necessarily have questioned it. *See, e.g., Hollingsworth*, 495 F.3d at 803-05; *Sidwell*, 440 F.3d at 869-70; *United States v. Stevens*, 380 F.3d 1021, 1024-25

(7th Cir. 2004). Accordingly, the district court did not err in denying the motion to suppress.


### 2. *Admission of Other Crimes Evidence under Rule 404(b)*

Despite the stolen check found in his bedroom, Culbert's defense, disclosed during his opening statement and pressed through his own testimony and his cross-examination of the government's witnesses, was that the prosecution had a circumstantial case but no witness who directly tied Culbert to the Treasury checks stolen from LAPDC. Culbert's sister did not testify, and Vaughn, who inculpated Culbert, had never met him. The government, in order to solidify its evidence that Culbert indeed stole the Treasury checks, called Allen Moody, who testified that he cashed $44,000 in stolen Treasury checks that he received from Marlon Flowers, who in turn said he "got them from John." The government submitted tapes of two telephone calls that Moody placed to Culbert in early 2003 at the urging of investigators. During those telephone calls, which were played at trial, Moody asked Culbert to get him more checks and reminded him that "it's tax season now man, you know they be coming." Culbert replied that he would see what he could do. All of this evidence came in near the end of the government's case when the district court finally denied Culbert's motion in limine. Culbert argues on appeal, as he did in the district court, that the introduction of Moody's testimony and the telephone conversation violated Federal Rule of Evidence 404(b). (Culbert also argues that what Flowers told Moody was inadmissible hearsay. But if we uphold the admission of Culbert's incriminating telephone conversation, then this question would be moot because Culbert's own statements about

providing checks to Flowers and Moody would necessarily render harmless any hearsay error in the admission of Flowers's statement.) We review the court's ruling for abuse of discretion. *United States v. Price*, 516 F.3d 597, 606-07 (7th Cir. 2008).

Evidence of extraneous bad acts is inadmissible as proof that the defendant acted in conformity with a propensity toward crime. FED. R. EVID. 404(b); *United States v. Taylor*, 522 F.3d 731, 732-33 (7th Cir. 2008). But such evidence is admissible to show, among other relevant facts, proof of opportunity. *United States v. Savage*, 505 F.3d 754, 760-61 (7th Cir. 2007); *United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006). Rule 404(b) does not act as a bar if

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Ross*, 510 F.3d 702, 713 (7th Cir. 2007) (citations omitted).

The government asserted and the district court properly accepted the theory that Moody's testimony and Culbert's recorded statements established, at the very least, that Culbert had the opportunity to steal checks from LAPDC. Moreover, Culbert provided stolen Treasury checks to Moody not long after he provided them to his sister and Holt and Vaughn, and the evid-

ence that he was doing so is overwhelming given his recorded telephone conversation with Moody. And although the admission of evidence under Rule 404(b) always poses some risk of prejudice, the district court did not abuse its discretion in determining that the probative value of evidence conclusively establishing that Culbert had the opportunity to personally steal the Treasury checks from the LAPDC outweighed the risk. Any danger of prejudice was mitigated by the district court's limiting instruction. *See United States v. Jones*, 455 F.3d 800, 809 (7th Cir. 2006) (explaining that limiting instructions can be effective in reducing or eliminating prejudice). As such, the evidence was properly admitted under Rule 404(b).

### 3. *Loss Amount*

Culbert next takes issue with the loss amount calculated by the district court in applying U.S.S.G. § 2B1.1(b)(1). Despite the hundreds of thousands of dollars in stolen Treasury checks that Vaughn deposited into his EZ Check Cashing account, the government apparently did not try to establish which of those checks passed through LAPDC. Nor did the government provide the probation officer with an alternate means of calculating the number or face value of the checks Culbert stole, and so the probation officer conservatively estimated, through means that Culbert cannot plausibly challenge here, that the checks he stole from LAPDC had a face value of at least $23,700. To this the probation officer added $13,756, the face value of the stolen check found in Culbert's bedroom, and $44,218, the confirmed face value of the Treasury checks that Culbert supplied to Flowers and Moody. The total, $81,674, was adopted by the district court. We

review a district court's loss calculations, which need only be "a reasonable estimate of the loss," U.S.S.G. § 2B1.1 cmt. 3(C), for clear error. *United States v. Zaccagnino*, 467 F.3d 1044, 1047 (7th Cir. 2006).

The district court did not clearly err in calculating the loss amount attributable to Culbert. The $13,756 check was correctly included in the loss calculation because it was found in Culbert's bedroom, included a zip code indicating that it passed through the postal facility where Culbert worked, and was stolen during the same time period in which Culbert stole Treasury checks from LAPDC as part of the charged conspiracy. *See* U.S.S.G. § 1B1.3(a)(2); *United States v. Frith*, 461 F.3d 914, 917-18 (7th Cir. 2006). And the $44,218 in stolen Treasury checks provided to Flowers and Moody were properly included in the district court's loss calculus because they were dated only a few months after Culbert was supplying nearly identical stolen Treasury checks to the charged conspiracy. *See* U.S.S.G. § 1B1.3 cmt. 9(A) (explaining that loss calculation can include amounts involving similar actors, victims, *modus operandi*, time, and purpose so as to constitute a common plan or scheme); *United States v. Swanson*, 483 F.3d 509, 514 (7th Cir. 2007) ("[R]elevant conduct not charged in the indictment is always fair game at sentencing.").

### 4. *Role in the Offense*

Culbert argues that the district court erred in denying his request for a two-level reduction for playing a minor role in the conspiracy. *See* U.S.S.G. § 3B1.2(b). We review the denial of a minor-participant reduction, which is reserved for those defendants who are "substantially less culpable than the average participant,"

U.S.S.G. § 3B1.2(b) cmt. 3(A); *see United States v. McGee*, 408 F.3d 966, 987 (7th Cir. 2005), for clear error, *see United States v. Emerson*, 501 F.3d 804, 815-16 (7th Cir. 2008). Here, the district court did not clearly err in its rejection of Culbert's request because Culbert, as the district judge recognized, was a "linchpin" of the conspiracy. He was the only known conspirator with direct access to the Treasury checks.

### 5. Upward Adjustment for Obstruction of Justice

Finally, Culbert challenges the district court's imposition of a two-level upward adjustment for obstruction of justice. *See* U.S.S.G. § 3C1.1. He argues that there was insufficient proof that he lied on the stand when he denied that the money his sister was giving him was in payment for stolen Treasury checks. We review the district court's legal conclusions de novo and its factual findings for clear error. *Price*, 516 F.3d at 606-07.

At trial, Culbert testified that the payments he received from his sister were loans to save his house from foreclosure. Yet, at the time of the payments, Sheryl was unemployed and receiving government assistance. And the thousands of dollars Culbert received far exceeded the $594 he needed per month to contribute toward his mortgage. The district court concluded that Culbert's testimony was not credible, and that conclusion is not clearly erroneous.

### B. Johnny Watts

### 1. The Maildrops

Watts first argues that the district court abused its discretion by admitting evidence that he was renting and

using commercial mailboxes in alias names. He contends that this evidence served no legitimate purpose and amounted to inadmissible "prior bad acts" evidence under Federal Rule of Evidence 404(b). As before, we review the court's ruling for abuse of discretion. *Id.*

This argument borders on frivolous. As the government pointed out at trial, Watts used the mailboxes to further his role in the conspiracy and conceal his connection to it. The "Mailboxes 4 U" address, obtained with a fake driver's license and false address, hid Watts's identity as the originator of four packages of stolen Treasury checks sent to Vaughn, as well as the payments he received from Vaughn in exchange. And Watts used the "Road Runner" maildrop, also created in a way that concealed his true identity, to open his Wells Fargo account and receive $62,900 in proceeds from the fraudulently cashed checks. Other mailboxes admitted into evidence were used by Watts as cross-references in connection with both the "Mailboxes 4 U" and "Road Runner" boxes. This evidence not only made Watts's participation in the conspiracy "more probable" than it would have been without the evidence, *see* FED. R. EVID. 401, but it also played an important role in identifying Watts as the person who committed the crimes in question since Vaughn could not positively identify him based on their one meeting, *see United States v. Lindemann*, 85 F.3d 1232, 1237 (7th Cir. 1996) (explaining that identification of defendant is "an essential element of any offense"). Further, the evidence helped demonstrate that Watts intended to conceal his receipt and use of proceeds from the stolen-check scheme, a point relevant to the conspiracy charge under § 1956(h). *See* 18 U.S.C. § 1956(h); *see also Ross*, 510 F.3d at 713. Finally, although the "Whitegate" mailbox had little to do with the others, the district

court's decision to admit it into evidence was harmless in light of the evidence connecting the other mailboxes to Watts's role in the conspiracy. Thus, the evidence was properly admitted.

*2. Loss Amount*

Like Culbert, Watts also argues that the district court erred in calculating the loss amount. It is undisputed that Watts provided Vaughn with stolen Treasury checks having a total face value of $135,100, but to this figure the district court added $74,760 representing the value of three counterfeit checks supposedly issued by Washington Square Mortgage Company. Two of these checks were deposited by Vaughn in November 2001 into Watts's account at Wells Fargo. Watts deposited the third into a Bank of America account he had opened in California. All three were dishonored. Watts contends, as he did in the district court, that these three checks should not have counted as relevant conduct because, in his view, there wasn't sufficient evidence tying them to the charged conspiracy. We review the court's finding for clear error. *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007).

We discern no error. The district court properly concluded that the three counterfeit checks were deposited into accounts opened and controlled by Watts as part of the same overall conspiracy involving him and Vaughn, *see* U.S.S.G. § 3B1.1, and thus constituted relevant conduct, *see* U.S.S.G. § 1B1.3. Moreover, it does not matter whether these counterfeit checks were conclusively tied to the Treasury-check scheme; they were tied to Watts, and where offenses are grouped in applying the sentencing guidelines, as is true here, *see* U.S.S.G. § 1B1.3(a)(2), a

defendant is always responsible for his own criminal conduct that is part of a common scheme or plan, *see Frith*, 461 F.3d at 917-18; *Swanson*, 483 F.3d at 514.


*3. Role in the Offense*

In his final argument, Watts contends that the district court committed clear error in finding that he recruited his wife to participate in the conspiracy, thereby increasing his offense level by two levels under U.S.S.G. § 3B1.1. We review a district court's decision regarding a defendant's role in an offense for clear error. *United States v. Ngatia*, 477 F.3d 496, 501 (7th Cir. 2007).

In April 2002, after Wells Fargo had closed Watts's account, Cheryl Watts opened a Wells Fargo account. On her application for the account, Cheryl listed a fake employer, which happened to be the same business Watts had listed when applying for a boat loan with Bank of America. Cheryl also used a false social security number and address on the Wells Fargo account application. And, on the day that she opened the Wells Fargo account, Vaughn attempted to deposit a $4,650 check made out to "C. Watts." This marked the only time the account registered any activity. We cannot say that the district court clearly erred in finding that Watts recruited his wife to participate in the conspiracy.


**III.**

The judgments of the district court are AFFIRMED in all respects.