In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 06-3702 & 06-4248

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CORNELIUS PRICE and VINCENT HAMILTON,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 1074—**David H. Coar,** *Judge.*

---

ARGUED NOVEMBER 2, 2007—DECIDED FEBRUARY 19, 2008

---

Before MANION, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* In this consolidated appeal, we review the convictions and sentences of two defendants, Cornelius Price and Vincent Hamilton, who, in separate jury trials, were found guilty of committing different Chicago bank robberies (18 U.S.C. § 2113(a)). Both were also convicted of carrying a firearm during their respective robberies (18 U.S.C. § 924(c)).

The district court judge (David H. Coar) sentenced Price to a term of 110 months for the October 2, 2002 robbery of First Security Federal Savings Bank, to be followed by a 300-month term on the firearm count. Hamilton

received a sentence of 151 months for the December 9, 2004, robbery of the North Community Bank, to be followed by an 84-month term for carrying a firearm.

Price's appeal points to several alleged errors by the district court: (1) admitting, as modus operandi evidence, facts relating to a March 11, 2003, robbery of Bank Chicago (Price pled guilty to robbing this bank); (2) excluding part of a statement Price gave to an FBI agent following his arrest in connection with the March 2003 robbery; (3) admitting, as business records, evidence about car purchases by Price and others right after the October 2002 robbery; and (4) imposing a mandatory minimum sentence under § 924(c)(1)(C) where Price's previous conviction under that section was neither alleged in the indictment nor proven at trial.

Hamilton argues that the court: (1) failed to consider 18 U.S.C. § 3553(a) factors in sentencing him; (2) improperly enhanced his sentence by two levels for obstruction of justice under U.S.S.G. § 3C1.1; and (3) improperly admitted evidence of an out-of-court conversation between Hamilton and a coconspirator.

Although this appeal concerns two robberies, each with a separate defendant, the cast of characters in both incidents (and a third robbery) are intertwined. So we begin with the facts as they were developed at the two trials, viewing the evidence, as we must at this time, in the light most favorable to the government. Many of the facts come from cooperating coconspirators, notably Cleve "Hollywood" Jackson.

At 6:50 a.m. on Wednesday, October 2, 2002, Taras Serafym, the assistant branch manager at the First Security Federal Savings Bank on Western Avenue in Chicago, arrived for work. At a gas station across the street, Jackson waited in a car with a walkie-talkie, watching the bank from a distance.

As Serafym opened the bank's exterior door, he was confronted by two men—Cornelius Price and Eddie Hill—wearing gloves, black stocking masks, and sweatshirts with hoods pulled over their heads. Each carried a gun and a walkie-talkie. Price pointed his gun at Serafym's head and forced him to open the interior bank door. Once inside the bank, Price directed Serafym into the vault room, where Serafym disabled the alarm. The robbers instructed Serafym to open the safe and empty its contents into a white laundry bag. He did as directed. The robbers pushed Serafym toward the rear door and instructed him to lie down. Using a walkie-talkie, Price and Hill summoned their getaway driver, Eddie's brother Michael Hill.

The job complete, the four men (Price, Jackson, and the Hills) sought refuge in the home of Eddie and Michael's mother. They gathered in the basement to divide up the loot—the handsome sum of $151,379.

In the two days after the heist, with the cash apparently burning a hole in their pockets, all four men purchased rather pricey used cars. Eddie Hill bought a Jaguar, Michael Hill bought a Lincoln Navigator, Jackson bought a Lincoln Navigator in the name of his more credit-worthy uncle (John V. Brown), and Price bought a Ford Expedition.

Five months later, a new target—Bank Chicago on South Torrence Avenue—attracted the attention of Price, who, this time around, went solo. At about 7:30 a.m. on March 11, 2003, Price, wearing gloves and a ski mask, confronted the teller unlocking the door to the bank. Pointing his gun at the teller, Price assured her that he didn't want anyone to get hurt. He just wanted the money—and quickly.

Price pushed the teller into the bank. She disarmed the alarm and opened the safe. Price handed the teller a

laundry bag, ordering her to fill it with money. The teller emptied two drawers' worth of cash into the bag. Price then ordered her to the floor and tied her hands behind her back with duct tape. He exited, bag in hand, through the front door.

The police caught Price after a brief foot chase, during which Price dropped his ski mask and the laundry bag. The officers arrested Price and, while patting him down, found a gun and car keys with an attached keyless entry remote. With the remote, using the kind of police work that would make McNulty and "The Bunk" of *The Wire* proud, the officers walked around, continually pressing the "unlock" button around cars parked in the vicinity of the bank. Eventually, the remote found its mate: a 1997 black Ford Expedition, the one purchased by Price a day after the October 2002 robbery. The police also recovered the take from the bank—$31,983.

Although Price eventually admitted that he owned the Ford Expedition and that he had committed the robbery, he maintained that this was his first and only heist.

About a week before the third robbery—which struck Chicago's North Community Bank on West Division on December 9, 2004—Hamilton, Eddie Hill, Lavonas Troupe, and Jackson attended a party. There, Hamilton, Troupe, and Jackson listened to Hill describe a robbery he was planning. Hill was confident that it would be easy: all he had to do was to grab a female employee opening the bank and push her through the unlocked door. As Hill moved on to describe past robberies he had committed, Hamilton repeatedly nodded his head, suggesting that he had helped Hill commit these crimes.

On December 9, 2004, at about 8 a.m., bank tellers Stephanie Hill and Wayne Bates reported for work. Standing at a bus stop across the street were Jackson and

Troupe, each carrying a gun and a walkie-talkie with an attached earpiece. As Ms. Hill approached the rear door of the bank, where her coworker, Bates, was waiting, Jackson and Troupe received word from Eddie Hill (the lookout) via walkie-talkie transmission that it was time to move. The two men—wearing hooded sweatshirts, latex gloves, and pantyhose over their faces—ran across the street toward Stephanie, who had begun to enter a code on a keypad to unlock the door to the bank.

Jackson grabbed Stephanie, pressed a gun against her back, and ordered her to open the door. Jackson and Troupe pushed both tellers into the bank. Stephanie directed the robbers toward the vault, which she opened after deactivating an alarm. As Stephanie attempted to access the safe within the vault, Jackson held a gun to Bates' head. Jackson instructed the tellers to hit the ground, and Troupe stuffed the money from the vault—$119,000—into a white canvas bag.

Jackson and Troupe left the bank through its rear door. They ran across a parking lot and crawled through a hole in a fence separating the lot from the alley. Hamilton was there waiting in the getaway van. Hamilton gunned it and drove off.

Tipped off by three witnesses who saw Jackson and Troupe enter the bank and, minutes later, escape into the alley, the police were hot on the robbers' trail. A high-speed chase covering about 15 blocks ended suddenly when Hamilton crashed the van into a pole. Hamilton, Troupe, and Jackson jumped out of the van, running. The robbers made little headway, however, since Hamilton had driven into a parking lot enclosed by a tall chain-link fence. All three were caught and arrested. A search of the van produced a white canvas bag containing $119,990; a loaded .380 caliber semi-automatic Beretta handgun; a loaded .38 caliber revolver; latex gloves; black gloves; and

three walkie-talkie radios, two of which had ear pieces. The lookout, Eddie Hill, who was not in the getaway car, was sucked into the case when Jackson's sister (who was also Troupe's fiancée) cooperated with police and recorded a conversation with him wherein he admitted his involvement in the robbery.

Price first argues that the district court should not have admitted evidence of his involvement in the March 2003 bank robbery since any similarities between it and the October 2002 heist for which he was on trial were generic. We review a district court's decision to admit evidence under Rule 404(b) for an abuse of discretion. *United States v. Owens*, 424 F.3d 649, 653 (7th Cir. 2005).

Whether or not evidence is admissible under Rule 404(b) requires a balancing of interests. Here, in an argument often made in cases of this sort, Price says the evidence the government offered—his involvement in the March 2003 robbery—was both remote and dissimilar to the charged October 2002 robbery. He also claims that the prejudicial effect of the evidence far outweighed its probative value.

It is true, as Price argues, that some of the similarities between the two robberies are very general. In both heists, each robber wore a hooded sweatshirt, wore some kind of a mask (a ski mask or pantyhose), carried a gun, and collected the stolen money in a white cloth bag. Certainly, a disguise, gun, and bag for the loot are relatively standard bank robber "accessories." *See United States v. Seals*, 419 F.3d 600, 607 (7th Cir. 2005).

The crimes, of course, are also somewhat different. Price committed the March 2003 robbery alone and escaped on foot. The October 2002 robbery, Price argues, was complicated by comparison: four robbers with walkie-talkies

and a lookout car escaped from a bank in a getaway vehicle.

What the district judge found significant, though, as do we, is the specific techniques used by the actual robbers in both crimes. Each robbery was an early weekday morning ambush of an employee opening a bank for business. Likewise, in each, the robber(s) forced the bank employee(s) at gunpoint to enter the bank, turn off the alarm, access the vault, and hit the ground before the robbers made their escapes. The banks were located only 5.4 miles apart. The crimes took place within five months of each other.

In evaluating the probative value of modus operandi evidence, we focus on the commonalities between the charged crime and the other act—not on their differences. *United States v. Vaughn*, 267 F.3d 653, 659 (7th Cir. 2001). The parallels between the two crimes strongly suggest that Price, who pled guilty to the March 2003 robbery, likewise was involved in the October 2002 robbery.

We are also convinced that the district judge did not abuse his discretion when he concluded that the probative value of evidence of the March 2003 robbery was not substantially outweighed by the danger of unfair prejudice. As the government notes, evidence of the March 2003 robbery was presented in a relatively sterilized form. The facts were presented dispassionately from a plea agreement— not from live, dramatic testimony of the victim. Also, the risk of unfair prejudice was slight, since, because the similarities between the robberies were substantial, the probative value of the March 2003 evidence is significant. *See United States v. Anifowoshe*, 307 F.3d 643, 647-48 (7th Cir. 2002).

Price next argues that under the rule of completeness, the district judge should have admitted a portion of his

statement to the FBI where he said that it was the only robbery he ever committed. According to Price, this statement clarifies a statement he made in 2005 where he said he would "cooperate" with the FBI by providing details about the October 2002 robbery (including the names of those involved).

We review the district court's decision to admit evidence on the basis of completeness for an abuse of discretion. *United States v. Glover*, 101 F.3d 1183, 1190 (7th Cir. 1996).

We have held that, under the doctrine of completeness, codified in Federal Rule of Evidence 106, a party against whom a "fragmentary statement" is introduced may ask the district court to admit other parts of the statement necessary to "clarify or explain the portion already received." *Glover*, 101 F.3d at 1183, 1189.

By allowing litigants to present a broader picture of the evidence, the completeness rule prevents the jury from being misled by a statement introduced out of its true context. Although Rule 106 applies only to written statements, we apply the same analysis to oral statements (such as Price's statements to the FBI). *See*, *e.g.*, *United States v. Li*, 55 F.3d 325, 329 (7th Cir. 1995).

As the party seeking to admit the additional evidence, Price must establish both that the evidence is relevant to the issues in the case and that it clarifies or explains the portion offered by the government. *See Glover*, 101 F.3d at 1190. To determine whether the evidence serves a clarifying purpose, the district court must ask whether the evidence: (1) explains the evidence already admitted; (2) places the admitted evidence in its proper context; (3) will serve to avoid misleading the trier of fact; and (4) will insure a fair and impartial understanding of all of the evidence. A judge need not admit every portion of

a statement—just those needed to explain portions previously introduced. *See Li*, 55 F.3d at 329-30.

We agree with the district judge that Price's March 2003 statement was not necessary to explain the admission he made nearly two years later. Price's March 11, 2003, statement that that day's heist was his first and only robbery, although relevant to the question of whether Price participated in the October 2002 robbery, is too remote to clarify a statement Price made in January 2005.

A statement admitted on "completeness" grounds must be connected contextually to the previously introduced evidence, such that the exclusion of that statement is likely to create an incomplete, misleading, or distorted picture of the evidence. Price's March 2003 statement does not fit the bill. In January 2005, Price and the FBI agent did not pick up where they left off in their March 2003 conversation; the context was not the same. Price's January 2005 words did not directly modify or explain what he said in March 2003. Because the March 2003 statement does not in any way "complete" Price's January 2005 admission, the district court properly excluded the March 2003 statement.

In his next argument, Price contends that the district court erred in admitting evidence of Eddie Hill's purchase of a Jaguar two days after the October 2, 2002, robbery. Price argues that because American Car Exchange employees would, at a purchaser's request, misrepresent two significant pieces of information on a vehicle's purchase order, the purchase order was insufficiently trustworthy to be admissible as a business record under Federal Rule of Evidence 803(6).

First, at the request of the buyer, the employee would inaccurately designate on the purchase order someone who had accompanied the buyer to the store as the "pur-

chaser" of the vehicle. Second, the employee sometimes underreported the vehicle's purchase price and the purchaser's down payment.

We generally give great deference to the district court's decision to admit evidence as a business record. *United States v. Zapata*, 871 F.2d 616, 625 (7th Cir. 1989). In addition, we tend to overlook accidental errors or omissions made by employees who generally seek to record information accurately. *See*, *e.g.*, *United States v. Keplinger*, 776 F.2d 678 (7th Cir. 1985). Here, however, American Car Exchange's purchase orders, which employees frequently and deliberately crammed with inaccurate information at the request of the purchaser, are in a league of their own. Although employees were able to confirm the identity of the car purchaser or his companion by requesting a driver's license or some other identification, *see*, *e.g.*, *Zapata*, 871 F.2d 616, the fact that some grain of truth can be extracted from a record prepared under general circumstances of untrustworthiness cannot elevate the record to a "business record" status.

Although the district court erred in admitting the purchase order as a business record, this error was harmless. The jury was presented with substantially similar evidence of car purchases by the remaining participants in the October 2, 2002, robbery: Michael Hill, Jackson, and Price himself.

Next, Price argues that the district court improperly sentenced him to a 25-year mandatory minimum sentence under § 924(c)(1)(C) because Price's previous conviction under that section was neither alleged in the indictment nor proven at trial. This argument, too, has no merit.

The Supreme Court has held that a judge may find facts that trigger a mandatory minimum sentence; these

facts need not be charged in the indictment or proven to a jury beyond a reasonable doubt. *Harris v. United States*, 536 U.S. 545, 560, 122 S. Ct. 2406, 2415 (2002). As a result, the district court could properly conclude that Price had been previously convicted under § 924(c)(1) and therefore deserved a 25-year mandatory minimum sentence under that section.[1]

Hamilton first argues that the district court, in sentencing him, failed to consider the § 3553(a) factors. We use a nondeferential standard of review when determining whether the district court followed proper post-*Booker* sentencing procedures. *United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1046 (7th Cir. 2005).

The district judge's obligation is not to apply all § 3553(a) factors mechanically or in a "checklist fashion" but to calculate the guideline range accurately and to explain why, consistent with § 3553(a), the sentence is appropriate. *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005). Judge Coar did just that here.

The judge gave ample opportunity to both sides to present their arguments. Hamilton requested a below-range sentence on the ground that, before he was arrested for the robbery, he had kept a steady job for a number of years. He also wanted to return home as soon as possible to provide for his wife and children, who were struggling financially and emotionally in his absence.

After giving the government an opportunity to respond, Judge Coar responded to the issues Hamilton raised

---

[1] Price also suggests that his sentence should be vacated because the government mistakenly informed him at the arraignment that he faced a mandatory minimum sentence of 5 years. Because Price cites no case law in support of this argument, however, we need not address it. *See, e.g.*, *United States v. Mason*, 974 F.2d 897, 901 (7th Cir. 1992).

and touched upon many § 3553(a) factors, including the nature of the offense, Hamilton's history and characteristics, and the need for the sentence to reflect the seriousness of the offense. He observed that Hamilton was a "good father" who, in committing the bank robbery, sought to provide for his family. Yet, Judge Coar believed that Hamilton had "forfeited [his] right to participate" in his children's upbringing by committing a serious crime involving guns, placing many individuals—including innocent bystanders—at risk. The severity of the crime, Judge Coar explained, warranted a serious punishment.

The judge concluded that Hamilton deserved a low-end-range sentence because he was less culpable than the other participants in the robbery and committed the crime "for greed, pure and simple." Thus, Judge Coar properly considered the § 3553(a) factors in sentencing Hamilton.

Hamilton also attacks the reasonableness of his sentence, arguing that because the district court did not consider the § 3553(a) factors, it did not impose a sentence "sufficient, but not greater than necessary" to meet the goals set forth in 18 U.S.C. § 3553(a).

The only way Hamilton can rebut the presumption of reasonableness we give to his sentence, which was properly calculated under the guidelines, is by demonstrating that his sentence is unreasonable when measured against the factors set forth in § 3553(a). *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Hamilton has failed to do so. Stating only that "[a]pplication of the [3553(a)] factors . . . cannot justify a sentence of 235 months," Hamilton fails to engage in this analysis altogether. As a result, we conclude that his sentence was reasonable.

Hamilton next contends that the judge failed to make the findings necessary to support his decision to impose a two-level enhancement for obstruction of justice under sen-

tencing guideline § 3C1.1. We review *de novo* the adequacy of the district court's obstruction of justice findings and any underlying factual findings for clear error. *United States v. Sheikh*, 367 F.3d 683, 686 (7th Cir. 2004).

A court may impose a two-level enhancement under U.S.S.G. § 3C1.1 if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." Obstruction of justice includes perjury, which occurs when a witness testifying under oath gives false testimony about a material matter with the willful intent to provide false testimony, instead of as a result of confusion, mistake, or faulty memory. *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993).

At trial, Hamilton testified that he believed he was driving his codefendants to a marijuana transaction—not a bank robbery. He claimed that he sped away from the police in the getaway van because he was under duress: his codefendants had put a gun to his head. Hamilton also testified that he deliberately crashed the van into the pole to put an end to the high-speed chase and subsequently fled the crash scene because he thought the van was going to explode.

Judge Coar concluded that Hamilton's testimony wasn't credible: "Mr. Hamilton's testimony was simply unreasonable and in my opinion untrue at trial." The judge noted that while Hamilton had a right to testify on his own behalf, "he did not have a constitutional right to lie on the stand under oath." That Hamilton lied, it seems to us, is quite obvious.

Finally, Hamilton argues that the district court erred in admitting Troupe's testimony that a few days before the December 9, 2004, robbery, he attended a party dur-

ing which he heard Hill bragging about previous robberies he had committed. As we previously noted, during Hill's commentary, Troupe observed Hamilton repeatedly nodding his head, suggesting to Troupe that Hamilton helped Hill commit these robberies. Because Hamilton failed to raise this issue before the district court, we review his argument only for plain error. *United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000). And the argument has no merit.

First, Hill's statements about previous robberies he committed are admissible as coconspirator statements under Evidence Rule 801(d)(2)(E). Hamilton does not dispute that the government established by a preponderance of the evidence that a conspiracy to commit a new robbery existed, that the declarant (Hill) and the defendant (Hamilton) were members of that conspiracy, and that the statements—aimed at recruiting new members—were made in furtherance of the conspiracy. *See United States v. Skidmore*, 254 F.3d 635, 638 (7th Cir. 2001).

In addition, evidence of Hamilton's head-nodding during Hill's description of his previous criminal conquests was properly introduced as an adopted admission under Evidence Rule 801(d)(2)(E). Certainly, Hill's comment did not directly link Hamilton to the robbery and therefore doesn't fit into the category of statements that, if he were innocent, Hamilton would feel compelled to deny, *see United States v. Ward*, 377 F.3d 671, 676 (7th Cir. 2004). Likewise, Hamilton's head-nodding might suggest not that he was adopting Hill's statements, but that he was impressed by Hill's criminal exploits. Nevertheless, because Hill's statement was made in Hamilton's presence and because Hamilton appeared to adopt it as his own—signifying that he, too, participated in these crimes—the statement was admissible under Rule 801(d)(2)(E).

For these reasons, we AFFIRM both judgments of the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*