In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3341

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

EDDIE HILL,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 1074—**David H. Coar**, *Judge.*

ARGUED SEPTEMBER 8, 2008—DECIDED DECEMBER 31, 2008

Before POSNER, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Eddie Hill was indicted for two Chicago-area bank robberies, one occurring in 2002 and the other in 2004. The four-count indictment also included two corresponding counts of possessing a firearm during the commission of a crime of violence related to each of the robberies. A jury found Hill guilty of the charges associated with the 2004 robbery but was unable to reach a verdict on the 2002 robbery and the related

firearm count. The district judge accepted the verdicts on the 2004 counts and declared a mistrial on the other two counts. Rather than proceeding with an immediate retrial of the 2002 charges, the court held a sentencing hearing on the 2004 counts, which resulted in a sentence of imprisonment of 360 months for Hill. Hill argues in this appeal that his convictions should be reversed on two grounds—the jury selection process and the admission of evidence documenting his purchase of an S-Type Jaguar shortly after the 2002 robbery.

## I. Background[1]

Eddie Hill, his brother Michael, Cornelius Price, and Cleve Jackson planned to rob a bank in the fall of 2002, or at least Jackson so testified as a witness for the government during trial. According to Jackson, this group drove to the First Security Federal Savings Bank in Chicago the morning of October 2, 2002. Jackson's role was to be the lookout, Michael was the getaway driver, and Price and Hill performed the robbery. Jackson watched as Price and Hill accosted a bank employee who was unlocking the outer door of the bank. The bank

---

[1] We recount the facts in the light most favorable to the verdict. *United States v. Gibson*, 530 F.3d 606, 607 (7th Cir. 2008). We discuss the trial testimony about the 2002 robbery because of its connection with the 2004 robbery, mindful that Hill was only convicted of the 2004 counts. There is no dispute that the robberies were properly joined in a single indictment and trial.

employee testified that two men rushed up to him while he was opening the door and pressed a gun against his back. They forced him to turn off the alarm and put cash from the vault into a laundry bag. The men escaped from the bank through a back door with approximately $151,000.

In December 2004, Hill and Jackson planned to rob another bank, this time with two other cohorts, Vincent Hamilton and Lavonas Troupe. During this venture, Hill was stationed as the lookout, Jackson and Troupe performed the robbery, and Hamilton was the getaway driver. Jackson and Troupe approached two bank employees as they were entering the North Community Bank in Chicago. Jackson pointed a gun at the employees and forced them to give the men access to the vault and turn off the alarm. Jackson held a gun to the head of an employee as she opened a safe within the vault. Jackson and Troupe escaped into the getaway van through an alley behind the bank with approximately $119,000. This time, however, the robbers were not so lucky, as two witnesses observed Jackson and Troupe pushing the employees into the bank. They called the police, who arrived on the scene just as Hamilton was driving away. The witnesses, who were waiting across the street at a gas station, pointed the police in the direction of the getaway van and pursuit was quickly underway. The police chase ended, as they often do, when the getaway van crashed into a pole. Jackson and Troupe attempted to flee on foot—and ran straight into an area enclosed by a fence. All three men were arrested. Later, Jackson's sister (who was also Troupe's girlfriend)

recorded a conversation with Hill in which he described his involvement in the robbery as the lookout.

Hill, Michael, and Price were charged in connection with the 2002 robbery. Price was convicted of bank robbery and possessing a firearm during the commission of a crime of violence. Hill and Michael were tried together, and the jury was unable to reach a verdict as to the counts against either of them arising from this robbery. Michael later pled guilty to the lesser charge of bank larceny for this offense.

Hill, Jackson, Hamilton, and Troupe were charged in connection with the 2004 robbery. Jackson and Troupe pled guilty to the robbery and possessing a firearm during the commission of a crime of violence. Hamilton was tried separately from the Hill brothers, and like Eddie Hill, was convicted of the 2004 bank robbery and possessing a firearm during the commission of a crime of violence. This appeal involves only Eddie Hill.

## II.  Jury Selection

Hill argues that the district court violated the procedure used for peremptory strikes and selecting alternate jurors, which left him unable to properly cure bias that remained undiscovered because of an inadequate voir dire. Federal Rule of Criminal Procedure 24 sets out the process for exercising peremptory strikes and selecting alternate jurors. For a felony charge (i.e., a crime punishable by imprisonment for more than a year), the government has six peremptory challenges and the defense

(either a defendant, if tried alone, or defendants, if tried jointly) has ten peremptory challenges. Fed. R. Crim. P. 24(b)(2). The court can impanel up to six alternate jurors, who must replace jurors in the same sequence in which the alternates were selected. Fed. R. Crim. P. 24(c)(1)-(2). When one or two alternate jurors are empaneled, one additional peremptory challenge is permitted (and more if additional alternate jurors are to be selected). Fed. R. Crim P. 24(c)(4).

In *United States v. Mendoza*, 510 F.3d 749, 753 (7th Cir. 2007), we noted that it was the usual practice of a particular district court judge to seat sixteen jurors to hear the evidence presented and then randomly select four individuals to be alternates after the presentation of evidence. Though we acknowledged there were some benefits to proceeding in that manner, we held that deviation from Rule 24 was not within the sound discretion of the district court, and we asked the court to discontinue its practice. *Id.*; *see also United States v. Delgado*, 350 F.3d 520, 524 (6th Cir. 2003) ("Federal rules of procedure should not, of course, be disregarded by courts any more than by litigants."). We concluded that the error was not reversible because the defendant did not demonstrate that the error affected his substantial rights by showing, for example, that the jury was not impartial. *Mendoza*, 510 F.3d at 754.

The trial in this case tool place several months before the release of our opinion in *Mendoza*, so neither the trial judge nor counsel had the benefit of the *Mendoza* admonition. Consequently, the prosecutor and Hill's attor-

ney agreed to a procedure for jury selection (which also varied from the strictures of Rule 24) and suggested it to the judge.

> MR. POPE [Assistant U.S. Attorney]: I have spoken with defense counsel, and what we would propose to the Court is that . . . the government be allotted 8 peremptory challenges, the defense be allotted 13 peremptory challenges. That is for both the actual jury and then the alternate jurors, all of which [are] to be used at once not reserving the one and one as suggested by the rules. And I also would suggest that we just have two alternate jurors in this case given that we're likely to have four, maybe five days of trial in this case.

> THE COURT: Now, which jurors will be—since we're going to do it that way, which jurors will be the alternates?

> MR. POPE: What I would propose, Your Honor, is given how you select yours, it would be the last jurors on what, you know, is termed the judge's list. Whoever jurors 13 and 14 are on that list as you count through, that those would be the alternate jurors.

> MR. WILLIS [Michael's Hill's Attorney]: I agree with [that].

> MR. HUNTER [Eddie Hill's Attorney]: I agree as well.

  Accordingly, this agreed procedure was used. The government concedes that the court erred by allowing this method of exercising peremptory strikes, but it contends that Hill has waived any error by affirmatively

agreeing to the method. Hill argues that the error is of a type that cannot be waived, and he urges us to review for plain error. As we have often explained, a waiver is a knowing and intentional relinquishment of a right, and forfeiture is an unintentional relinquishment. *United States v. Knox*, 540 F.3d 708, 713 (7th Cir. 2008). Waiver precludes appellate review, but forfeiture allows us to review for plain error. *Id.*

In *Mendoza*, we reviewed for plain error because there was no indication that the defendant had affirmatively agreed to the error. Because Hill, through his counsel, unequivocally agreed to the procedure used in this case, Hill instead suggests that compliance with Rule 24 is not waivable. He offers the analogy of the right to a unanimous jury, which is both constitutionally protected and part of the Federal Rules of Criminal Procedure. *United States v. Fawley*, 137 F.3d 458, 470 (7th Cir. 1998); Fed. R. Crim. P. 31(a). His analogy is inapt. A defendant's willing divergence from the proper method used to select jurors is quite different from allowing a defendant to risk his liberty through a verdict that is not unanimous. Hill suggests that because we stated in *Mendoza* that the district court did not have discretion to re-write the rules, surely the parties cannot be entitled to craft their own rules either. Indeed, the parties are not entitled to craft their own rules. But where the district court has erred by allowing the parties to diverge from the selection procedure in Rule 24, the defendant should not be entitled to receive the benefit of a new trial for a procedural error that he helped to create.

Even if we were to treat this as a case of forfeiture and review for plain error, Hill would not prevail. To reverse for plain error, we must find that Hill established a clear error that affected his substantial rights and impacted the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) (citing *United States v. Allen*, 529 F.3d 390, 395 (7th Cir. 2008)). The government concedes that if the concept of forfeiture is applied, the error is plain, and Hill goes one step further to argue that his substantial rights were violated because an inadequate voir dire caused the selection of a biased jury. The primary reason for the existence of peremptory strikes is "to help secure the constitutional guarantee of trial by an impartial jury," *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000), and Hill argues that the unusual procedure adopted in this case deprived him of the ability to cure the jury's bias through the exercise of peremptory strikes. As noted by the panel at oral argument, an inadequate voir dire resulting in a biased jury is reversible error in itself; an additional failure of the curative process through the use of peremptory strikes would be unnecessary. Nevertheless, we analyze the issue as Hill has framed it.

"It is axiomatic that the purpose of *voir dire* is to ensure that the defendant will have an impartial jury." *United States v. Guy*, 924 F.2d 702, 707 (7th Cir. 1991). Federal courts have broad discretion to determine appropriate questions for voir dire, subject to "essential demands of fairness." *United States v. Hasting*, 739 F.2d 1269, 1272 (7th Cir. 1984) (citing *Aldridge v. United States*, 283 U.S. 308,

310 (1931)). We look to the district court's questions to determine whether the court's method of testing impartiality created "a reasonable assurance that prejudice would be discovered if present." *Guy*, 924 F.2d at 707 (citing *United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972)). Hill does not have to prove that a jury member was, in fact, biased. *Id.*

In this case, the district court began questioning for bias with the following admonishment to the venire:

> Now, ladies and gentlemen, we all have the God given right in this country to believe whatever we like and to make decisions as we see fit. Outside of this courthouse and in our personal lives you can make decisions and judge people on any basis you choose. Opinions about wealth, occupation, political party, religious affiliation, color, race, size, sex, national origin, whatever you think is important. As a human being I have deeply held opinions and biases, and I suspect that you have some too. But I have taken an oath that says as a judge I will to the very best of my ability put my stereotypes and biases aside and decide cases on the merits, not based on my personal views.
>
> If you're selected as a juror in this case, you must take an oath to do the same thing. The question that we have to answer in jury selection is whether any of you have particular biases that you cannot put aside. So for the next couple of hours that's what we're trying to find out. The lawyers, the parties, and I are going to need to get to know you a little bit so

that we can make our own judgments about whether or not you can sit as a fair juror in this case.

The court then summarized the indictment and explained the presumption of innocence and the burden of proof. The court asked the prospective jurors if anyone had heard anything about the case. After questioning one prospective juror who volunteered that she had heard about one of the robberies, the court continued:

Having heard the charges, is there anyone here who feels that he or she should not be a juror in a case in which those are the charges? If so, please raise your hand.

Is there anyone who believes that there's anything about the nature of the case that would make if difficult for him or her to sit as a fair juror in the case? If so, please raise your hand.

None of the prospective jurors responded.

The court then individually asked all of the prospective jurors typical biographical questions to ferret out bias, such as where they and their family members lived and worked, whether they had ever been arrested, whether they had been involved in any lawsuits, and whether they knew any of the attorneys, defendants, or witnesses. The court asked follow-up questions when prospective jurors gave answers that might indicate bias. Several prospective jurors responded that they might have some bias because they had negative experiences with a lawsuit, they had been a victim of a crime, or they had positive or negative experiences with the po-

lice. The district court gave the prospective jurors the opportunity to discuss any other potential biases outside of the presence of the other jurors. Finally, the court and attorneys asked several prospective jurors additional questions at a side bar.

Hill's arguments focus on a particular prospective juror, so we recount the court's interaction with him. Prospective Juror Salvador indicated that he had worked as a contractor for the federal government focusing on computer network issues. When the court asked whether his previous job experience would have an affect on his ability to be impartial in the case, Mr. Salvador claimed that it might. Later, when the court asked if anyone had any positive or negative feelings about the Chicago Police Department or the Federal Bureau of Investigations, Mr. Salvador spoke up again. He explained that his home had been burglarized once and the Chicago Police Department took a very long time to arrive. They took some fingerprints but never got back to him with any more information. He claimed the negative experience with the police would affect his ability to be impartial in the case. Finally, the court called Mr. Salvador to answer some questions at a side bar:

> THE COURT: Mr. Salvador, I still don't understand . . . why working [as a government contractor] might impact you in this case.

> MR. SALVADOR: It goes further than that. . . . I don't know if you have time to listen to it. I was brought up by a father who was pro-government, pro-law. This is when I was a little kid, he engrained [sic] this into

me. As I grew older, I was even more so, so much so that I don't believe in the rights of criminals. I'll be honest with you, Judge. I just don't, and I never have. If a criminal was going to take away the rights of the victims he intimidated or hurt, then certainly he's not worthy of any rights himself. I'm sorry. That's how I feel.

THE COURT: That's the way you feel.

MR. SALVADOR: Condemn me for it, but it's true. I've always been pro-law and pro-death penalty.

THE COURT: Anybody got any questions?

MR. HUNTER [Eddie Hill's Attorney]: When the judge asked you—everybody if they had a problem with the presumption of innocence or the right to remain silent, you didn't raise your hand.

MR. SALVADOR: No, because it means nothing. It really doesn't. My mind's already made up. Whether or not a person takes the 5th Amendment so he won't incriminate himself, whatsoever, makes no difference. I already have an opinion of criminality. It may not be the most logical, but it's how I believe.

MR. POPE [Assistant U.S. Attorney]: But you don't believe somebody should have the right to remain silent?

MR. SALVADOR: It's up to them. Because if the evidence support that that criminal—the alleged criminal is guilty of that crime. I look at it this way: A person would never have been arrested unless the police had some pretty good proof.

The experienced trial judge immediately dismissed Mr. Salvador for cause, aptly expressing to the attorneys that Mr. Salvador seemed to be using every possible reason to get out of jury duty. The court also dismissed several other prospective jurors for cause, and then the parties exercised their peremptory challenges. None of the prospective jurors who indicated during voir dire that they might be biased was named as a juror or alternate juror.

Hill claims that Mr. Salvador's "bizarre and unexpected statements" at the side bar put the district court on notice that its earlier general questioning was insufficient to uncover bias, and the court should have asked additional questions. Hill acknowledges that we have previously held that general group questioning can be sufficient to uncover bias. *See, e.g.*, *Guy*, 924 F.2d at 707-08; *Hasting*, 739 F.2d at 1271-72. Hill argues, however, that despite the appropriate questions asked by the court, the atmosphere must have been so oppressive during the voir dire that prospective jurors, such as Mr. Salvador, did not feel comfortable airing unpopular views in front of the other jurors. Because the general questioning was inadequate, he argues, there is a reasonable likelihood that members of the actual jury were biased, even though Mr. Salvador was dismissed.

Some prospective jurors undoubtedly find voir dire intimidating, but Hill gives us no reason to believe that the atmosphere in this case was particularly stifling. The court asked appropriate general questions of the group and followed up with careful individual questioning of every prospective juror. No less than fourteen

prospective jurors felt comfortable enough to admit to an experience or a personal belief that might cause him or her to be biased. Mr. Salvador himself claimed to be biased twice during the individual questioning—once in favor of the government and once against the government. We simply cannot accept Hill's arguments that Mr. Salvador felt so constrained that he could not air his views in front of the other jurors and that his reluctance should be attributed to the whole group of prospective jurors. Perhaps Mr. Salvador actually held the beliefs he articulated at the side bar, in which case the district court properly safeguarded Hill's rights by dismissing him for cause. Or perhaps, as the district judge guessed, Mr. Salvador was merely attempting to be removed from the venire by claiming for a third time that he held a bias.[2]

---

[2] Though it's an unfortunate practice and poor citizenship (and, hopefully, rare), some prospective jurors attempt to avoid jury duty by making odd or inflammatory statements. This was recently parodied by the popular actress Tina Fey, whose character Liz Lemon in the television show *30 Rock* successfully avoided jury duty (in Chicago, no less) by dressing like Princess Leia (of *Star Wars* fame) and announcing "I don't really think it's fair for me to be on a jury because I can read thoughts." *30 Rock: Believe in the Stars* (NBC television broadcast Nov. 6, 2008), *available at* http://www.nbc.com/30_Rock/video/episodes/?vid=816701 (last visited Dec. 19, 2008).

While such conduct may be amusing in a television sitcom, it is not seen as humorous by trial judges in real life. Anyone attempting to gain rejection from jury service by providing false or disruptive information during voir dire should keep

(continued...)

In either case, the district court's method of testing impartiality has reasonably assured us that prejudice, if present, would have been discovered. *Guy*, 924 F.2d at 707 (citing *United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972)).

We also note that Hill received more peremptory challenges than he would have been entitled under Rule 24—the parties agreed that Hill would have thirteen strikes instead of ten for the jury plus one for the alternate jurors. Even so, Hill only used twelve of the thirteen strikes. Hill claims that he ultimately was only given twelve, but his citation in support of that argument is merely to the page of the transcript where the twelve strikes were used, which says nothing about how many strikes he had in total. We have previously rejected a defendant's challenge to the impartiality of the jury where the defendant had not used all of his available peremptory strikes. *United States v. Ricketts*, 146 F.3d 492, 496 (7th Cir. 1998).

### III.  Car Purchase Record

Hill also appeals the admission of certain evidence at trial. The government introduced business records showing that Hill, Michael, Price, and Jackson—"with the cash apparently burning a hole in their pockets," *United States v. Price*, 516 F.3d 597, 602 (7th Cir. 2008)—each purchased an expensive used car within two days of the

---

[2]  (...continued)
in mind that they are under oath during the process and that the trial judge has contempt powers.

2002 robbery. One of the records, from American Car Exchange, showed that Hill purchased a 2000 Jaguar on October 4, 2002, for $20,000, paying $8,000 in cash as a down payment.

The problem with the purchase record, however, is that sometime after Hill's car purchase but before his trial, American Car Exchange was indicted by the federal government on charges that included fraud and racketeering. Ramona Rodriguez, a former employee of American Car Exchange who was also indicted, testified at Hill's trial as the custodian of the record. She testified that, at the request of the buyer, American Car Exchange sometimes listed a different individual's name as the buyer. The listed individual had to be present and show identification. American Car Exchange also sometimes misreported the sales price and down payment of the car being sold. Hill contends that the district court erred by admitting the purchase record.

We review the district court's decision to admit evidence for an abuse of discretion. *United States v. LeShore*, 543 F.3d 935, 941 (7th Cir. 2008). Generally, we give great deference to the court's decision to admit a business record. *Price*, 516 F.3d at 605. A business record is not admissible where the source of information or the method or circumstances of preparation indicate lack of trustworthiness. *LeShore*, 543 F.3d at 941; Fed. R. Evid. 803(6). In *Price*—the appeal of Cornelius Price for his conviction for the 2002 robbery—we reviewed the court's decision to admit the same purchase record that is at issue in this case, Hill's car purchase record from American Car Exchange. We con-

cluded that because American Car Exchange "frequently and deliberately crammed [the records] with inaccurate information at the request of the purchaser," the district court erred in admitting Hill's purchase record under the business record rule. *Price*, 516 F.3d at 605. We held, however, that the error was harmless because the government had presented the jury with substantially similar evidence of car purchases by Michael, Jackson, and Price himself. *Id.*

The government concedes that the district court erred by admitting the purchase record but argues that the error was also harmless in this case. We agree. First, and most significantly, the evidence pertained to the 2002 robbery. Hill was only convicted on the 2004 counts. We can safely assume that the jury was not persuaded of Hill's guilt due to evidence that he bought an expensive car two years prior to the robbery in question. Second, the purchase record was not the only evidence that Hill bought a Jaguar shortly after the 2002 robbery because Jackson testified that he saw Hill driving a Jaguar a few days after the robbery; previously Hill only drove a Monte Carlo.

Hill contends that the record was still highly prejudicial to him because it associated him with a known criminal enterprise, which reflected poorly on his character. We are not persuaded by this argument. If the purchase record was so highly prejudicial, then it seems logical that the jury would have convicted him of the 2002 counts as well as the 2004 counts. Further, no one testified that Hill's purchase record was inaccurate or that Hill knew that

American Car Exchange engaged in illegal activity. A person's patronage of a business that is later indicted is not inherently prejudicial where there is no indication that the person knew of the illegality. The district court's decision to admit the purchase record was, at worst, harmless error.

## IV. Conclusion

We conclude that the district court's errors in the jury selection process and admission of evidence do not warrant reversal. Therefore, we AFFIRM.